Armindo SOARES, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. CV 97–2742(RR).

United States District Court,
E.D. New York.

Aug. 13, 1999.

Bonstrom, Murphy & Gordon LLP, New York City, by Kim P. Bonstrom, for petitioner.

Hon. Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, for respondent.

*AMENDED MEMORANDUM AND ORDER*

RAGGI, District Judge.

Armindo Soares is presently incarcerated serving a 188–month term of incarceration as a result of his 1994 conviction in this district for conspiring and attempting to possess cocaine with intent to distribute

it. Through counsel, Soares now moves pursuant to 28 U.S.C. § 2255 for an order vacating his conviction. Soares had previously challenged his conviction on direct appeal without success. *See United States v. Bahna*, 68 F.3d 19 (2d Cir.1995). Before this court, he now contends that (1) he was denied effective assistance of trial and appellate counsel in violation of the Sixth Amendment; (2) the prosecution failed to meet its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and their progeny; (3) he was denied a fair trial as a result of government misconduct; and (4) both the prosecution and the trial court intimidated potential defense witnesses in violation of petitioner's Sixth Amendment rights. The court has granted Soares considerable discovery on his claims. It has entertained successive written submissions in support of his evolving legal theories. Having carefully reviewed these materials as well as the opposition papers filed by the government, the court finds that Soares's claims must be rejected as either procedurally barred or without merit.

### Factual Background

1. *The Prosecution's Evidence at Trial*[1]

Armindo Soares's involvement in cocaine trafficking came to light as the result of a government investigation into the criminal activities of his brother-in-law, Mark Bahna. The inquiry was triggered, at least in part, by the 1988 arrest of Ralph Bencivengo, one of Bahna's confederates. After Bencivengo agreed to cooperate with the Drug Enforcement Administration, agents arranged for him to meet with Bahna on a number of occasions and to negotiate a reverse sale of a large quantity of cocaine. In the course of surveilling these meetings, agents learned that Bahna was assisted in his trafficking by Soares and William Lombard. Further investigation revealed that Soares and Lombard regularly obtained cocaine from Bahna and, in turn, sold it to their own customers.

a. *The Reverse Sale of Ten Kilograms of Cocaine*

1) *The January 4, 1990 Meeting at Caesar's Bay Bazaar*

After extensive negotiations, Bahna and Bencivengo agreed to meet at the Caesar's Bay Bazaar shopping center in Brooklyn on the night of January 4, 1990, to finalize the purchase of ten kilograms of cocaine. On that date, surveillance agents observed Bahna arrive at Caesar's Bay in a car driven by Soares. The cautious way in which Soares drove among rows of parked cars and the frequent movement of his head to check around him led the agents to conclude that he was looking for surveillance vehicles. This was subsequently confirmed by Bencivengo who reported that as soon as he met up with Bahna, that target warned him that their meeting was being surveilled. Bahna directed Bencivengo to enter Soares's car, whereupon petitioner drove to another section of the shopping center. As Bahna exited the vehicle, Soares brandished a gun toward Bencivengo and threatened to kill him if the informant was wearing a wire. Outside the car, Bahna searched Bencivengo to ensure that this was not the case. Bahna then told Bencivengo that he would need to see a sample of the cocaine before coming forward with any money. He reiterated this condition in a telephone call made a few minutes later from a nearby supermarket pay telephone to an agent posing as the cocaine supplier. When the agent/supplier rejected this new demand, Bahna and Soares drove away.

2) *The January 9, 1990 Meeting at the Floridian Diner*

Bahna and Bencivengo continued to speak over the next several days, eventual-

---

1. As detailed in the procedural history, *infra*, Soares was originally tried in 1990 and found guilty. A successful defense motion for a new trial prompted a second prosecution in 1994. The court here outlines the evidence adduced at his second trial since it serves as the basis for the conviction he now seeks to vacate.

ly agreeing to meet at the Floridian Diner in Brooklyn on January 9, 1990, in another attempt to consummate their cocaine transaction. Bahna arrived at the site at approximately 10:30 p.m. in a car driven by William Lombard. When Bencivengo entered that vehicle, Bahna and Lombard searched him. Lombard then drove to another location while Bahna again expressed concern about possible government surveillance. At approximately 11:30 p.m., in the parking lot of a nearby animal hospital, Bencivengo handed Bahna a package containing ten kilograms of sham cocaine, whereupon agents immediately placed Bahna under arrest. Lombard fled the scene but was apprehended some days later.

Soares was arrested later on the night of January 9, 1990, at Bahna's home. Initially, he falsely denied being at the Caesar's Bay shopping center on January 4, 1990. Subsequently, he admitted driving to that location and seeing Bahna search Bencivengo, but he denied all knowledge of a narcotics transaction.

### b. Other Evidence of Soares's Participation in the Charged Conspiracy

In addition to Bencivengo and the federal agents who were able to testify to events relating to the ten-kilogram transaction in January 1990, the prosecution called three other witnesses who implicated Soares in the charged narcotics conspiracy: Glenn Schaeffer, Charles Costa, and Ron Sahi.

#### 1) Glenn Schaeffer

Schaeffer testified that Bahna, for whom he worked as a "strong arm" in certain drug deals, had expressly identified his brother-in-law, Armindo Soares, as his partner. Schaeffer further stated that in a spring 1989 meeting at Bahna's house, he witnessed Soares return 600-800 grams of cocaine to Bahna complaining of its poor quality. Soon thereafter, Schaeffer participated in a conversation with Bahna and Soares as to the brands of cocaine then available and their prices and quality.

Schaeffer also recalled accompanying Bahna, in June 1989, to a Manhattan social club operated by Rocco Arena, a reputed member of organized crime. Arena told Bahna that Soares had to pay tribute money to the club since he was selling drugs in Greenwich Village. Bahna insisted that no money was owing since Soares was his partner and he was already paying Arena thousands of dollars. Schaeffer was present when Bahna reported this conversation to Soares and heard Soares refuse to pay Arena any more money.

. Schaeffer testified that in July 1989 he was present when Bahna took a kilogram of cocaine from the kitchen cabinet in his home and placed it in a baby satchel. His wife, Elizabeth Soares Bahna, who is also petitioner's sister, then picked up the satchel and carried it and her child into the car. The group proceeded to Soares's apartment where Schaeffer saw Bahna hand the kilogram of drugs to Soares and receive a paper bag of money in return.

#### 2) Charles Costa

Charles Costa testified that he was a customer of Mark Bahna who, in the spring of 1989, was offered a kilogram of cocaine for $17,000-$17,500. Bahna asked Costa not to mention the proposed price in front of his wife since he was selling the same quantity to her brother for $18,000-$18,500. Costa recalled another conversation in the summer of 1989 concerning Bahna's interest in acquiring five kilograms of cocaine from one of Costa's other sources. Bahna explained that two to three of the kilograms would be for Soares.

#### 3) Ron Sahi

Ron Sahi testified that he regularly bought cocaine from William Lombard. On one occasion in 1989, when Sahi picked up an eighth of a kilogram of cocaine from Lombard, he saw Lombard hand Soares a similar package. Lombard later told Sahi

that the package contained an eighth of a kilogram of high quality cocaine. Sahi recalled that in June 1989, he was riding in Lombard's car when Soares pulled alongside and asked if Lombard had heard anything yet about a cocaine shipment. Lombard later explained to Sahi that he and Soares worked together purchasing cocaine from various sources and then supplying each other. Sahi testified to a number of other conversations that he had in the following months with either Soares or Lombard about their efforts to procure cocaine. He stated that in early January 1990—about the time federal authorities were planning the reverse sale from Bencivengo to Bahna—Lombard told him that he and Soares were planning to make a drug purchase from one of Soares's sources in Brooklyn. Lombard also confided to Sahi that a Greenwich Village crime figure, Rocco Arena, was extorting money from Soares and Lombard because the two were operating in Arena's territory.

### 2. *Procedural History*

A brief outline of the procedural history of this case is necessary to address some of the issues raised in Soares's motion to vacate.

#### a. *Soares's 1990 Trial*

The prosecution initially tried Soares together with William Lombard before this court in June 1990. Mark Bahna had already pleaded guilty on March 12, 1990, to two counts of conspiring and attempting to possess ten kilograms of cocaine. Pursuant to a cooperation agreement, Bahna was obliged to provide full cooperation to federal authorities, but prosecutors had orally promised that they would not call him to testify against his brother-in-law, Armindo Soares.

Bahna's history of cooperation was troubled from the start. Immediately after his arrest, he had inculpated Lombard in his criminal activities, but exculpated Soares. On the eve of the Soares/Lombard trial, however, Bahna admitted that he had lied about his brother-in-law in order to assist him. These shifting positions were made known to Soares's first trial counsel, Robert Kalina, who himself interviewed Bahna. Ultimately, the defense chose not to call Bahna as a witness.

After the jury returned its verdict of guilty, both defendants moved for new trials. The court granted these motions on July 31, 1991, finding as to Soares that it had erred in limiting his presentation of character evidence.

#### b. *Soares's 1994 Trial*

Lombard did not stand trial again. Instead, on March 14, 1994, he pleaded guilty to conspiracy and attempt to purchase cocaine with intent to distribute it. Soares, however, now represented by Judd Burstein, was retried in March 1994 before then Chief Judge Thomas C. Platt.[2] Once again petitioner was found guilty of the narcotics charges against him. Judge Platt then transferred Soares's case back to this judge for sentencing.

Before this court, Mr. Burstein moved for yet another new trial, alleging a variety of errors in the proceedings before Judge Platt. After reviewing the parties' detailed submissions and hearing oral argument, this court denied the motion and, on September 27, 1994, sentenced Soares to concurrent terms of 188–months' imprisonment on both counts of conviction.

### 3. *Direct Appeal*

Mr. Burstein, with the assistance of Soares's present counsel, Kim Bonstrom, appealed Soares's conviction to the Court of Appeals. Counsel urged reversal on the grounds (1) that the jury selection process had violated Soares's Sixth Amendment rights, and (2) that the trial court had erred in (a) prohibiting the introduction of

---

**2.** It was to accommodate trial congestion in the court's calendar during a period of judicial emergency in the Eastern District that Chief Judge Platt accepted the trial transfer.

co-conspirator Mark Bahna's post-arrest statement exculpating Soares, (b) excluding a tape recorded conversation between Bahna and Bencivengo that made reference to Soares, and (c) refusing to instruct the jury that it could draw an adverse inference against the prosecution for its failure to call Bahna as a witness. The Second Circuit rejected these arguments in a published opinion. *See United States v. Bahna,* 68 F.3d 19 (2d Cir.1995).

### 4. § 2255 Petition

On May 13, 1997, Soares, now represented only by Mr. Bonstrom, moved this court to vacate his conviction pursuant to § 2255.

### Discussion

### I. *Procedural Default*

The government submits that most if not all of Soares's arguments could have been raised on direct appeal. Accordingly, it asserts that he is barred from seeking collateral review in this court unless he can show good cause to excuse his default and ensuing prejudice. *See, e.g., United States v. Perez,* 129 F.3d 255, 260–61 (2d Cir. 1997). As cause for his failure to challenge the ineffective assistance of his trial counsel, Soares cites the fact that the same attorney represented him on direct appeal. *See Billy–Eko v. United States,* 8 F.3d 111, 114 (2d Cir.1993) (superceded by statute on other grounds as noted in *Triestman v. United States,* 124 F.3d 361, 369 n. 8 (2d Cir.1997)). As cause for his failure to raise other issues on direct appeal, Soares submits that counsel was as ineffective on appeal as at trial. For the reasons stated *infra,* the court rejects these arguments. It finds that Soares was not denied effective assistance of counsel either at trial or on appeal. In any event, it finds that he was not prejudiced by the alleged deficiencies in counsel's performance since none of the claims now raised has any merit.

### II. *Ineffective Assistance of Counsel*

A prisoner asserting a claim of ineffective assistance of counsel must demonstrate both· (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) that counsel's ineffectiveness prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *Accord United States v. Trzaska,* 111 F.3d 1019, 1029 (2d Cir.1997).

When applied to a challenge to the representation afforded by appellate counsel, *Strickland* requires a prisoner to show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and signficantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994), and that "there was a 'reasonable probability' that [the omitted claim] would have been successful before the [appellate court]," *id.* at 534 (quoting *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992)). In considering the first prong of this test, a reviewing court must bear in mind that appellate counsel is not required to raise every colorable claim of error, even if requested to do so by a client. *See Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

Furthermore, whether *Strickland* is applied to trial or appellate counsel, a reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy.' " *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct.

158, 100 L.Ed. 83 (1955)). Paramount to the court's consideration of any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or appeal] cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052.

Soares's complaints about his counsel's performance at trial and on appeal do not satisfy the strict criteria of *Strickland.* Judd Burstein is a talented and conscientious advocate who appears regularly in the federal courts of this circuit. He enjoys a particularly high reputation for his thorough preparation of cases and careful analysis of difficult legal issues. The likelihood of his rendering objectively inadequate representation appears remote. Nevertheless, this court has carefully reviewed the trial and appellate records in this case. Indeed, the court had already reviewed the trial record once before when it considered Mr. Burstein's detailed motion to grant Soares a new trial. The court concludes that Mr. Burstein provided Soares with a high level of representation throughout the proceedings. *See generally Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (court may consider counsel's overall performance in assessing a Sixth Amendment challenge). At trial, he vigorously cross examined prosecution witnesses, made cogent legal arguments to the court, and argued forcefully to the jury. Similarly on appeal, Mr. Burstein presented four carefully briefed issues to urge reversal of Soares's conviction. The fact that co-counsel on appeal—now counsel on this motion—might have raised other challenges as well, is not evidence of constitutional ineffectiveness. Indeed, one of the crucial tasks that must be performed by an effective appellate advocate is to isolate out of a voluminous trial record the few key issues most likely to persuade a reviewing court to reverse and not to bury these "in a verbal mound made up of strong and weak contentions." *Jones v. Barnes,* 463 U.S. at 753, 103 S.Ct. 3308.[3]

In sum, Soares has totally failed to demonstrate that any action taken or choice made by Mr. Burstein at trial or on appeal was objectively unreasonable. Furthermore, it is apparent for the reasons stated *infra* that none of the challenges raised in this § 2255 motion has any merit. Thus, Soares cannot demonstrate that he was prejudiced by counsel's purported failure to raise certain issues.

### III. *Failure to Disclose Brady/Giglio Material Related to Mark Bahna*

Although Mark Bahna was available as a witness to both sides in this case, he was not called to testify at either of Soares's trials. Instead, Soares's trial attorneys fought persistently—albeit unsuccessfully—to put his exculpatory hearsay statement before the jury or, at least, to secure an adverse inference instruction based on the prosecution's failure to call Bahna. In a variation on this theme, Soares now asserts that, even though Bahna was not called as a witness, the government violated the Due Process Clause when it failed to turn over *Brady/Giglio* material about him. Specifically, Soares complains of the prosecution's failure to disclose that (1) the government had required Bahna to recant his post-arrest statement exculpating Soares and to testify against petitioner at trial in return for sentencing consideration pursuant to U.S.S.G. § 5K1.1, (2) DEA Agent Robert Yoos had threatened and intimidated Bahna to secure his cooperation, (3) Bahna had lied to authorities regarding Soares's "hidden wealth," and (4)

---

**3.** As the Supreme Court noted in *Jones,* experienced appellate advocates caution against raising "more than three or four matters" on appeal lest their arguments become "too diffuse and give[ ] the overall impression that no one claim of error can be serious." *Jones v.* *Barnes,* 463 U.S. at 752 n. 5, 103 S.Ct. 3308 (quoting Committee on Federal Courts of the Association of the Bar of the City of New York, Appeals to the Second Circuit 38 (1980)).

there had been a joint debriefing session attended by Bencivengo and Bahna before Soares's trial. Soares contends that he was entitled to this material because the government offered Bahna's out-of-court statements in furtherance of the charged conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). Thus, he was entitled to impeach Bahna pursuant to Fed.R.Evid. 806 and should have received the same *Brady/Giglio* material as if Bahna had testified at trial. He further submits that if he had known of the government's misconduct in dealing with Bahna, he could have attacked the overall integrity of the government's case. Finally, Soares submits that the government's failure to provide the material at issue made it impossible for him to make an intelligent choice as to whether to call Bahna as a defense witness.

None of these arguments has merit. For reasons discussed more fully *infra*, the court finds that the government did not withhold from Soares information pertaining to Bahna's agreements with the government. It further determines that there was nothing in Agent Yoos's conduct toward Bahna nor in Bahna's contact with Bencivengo that undermines confidence in the outcome of Soares's trial. *See generally Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Orena*, 145 F.3d 551, 557 (2d Cir.1998).

### A. *Bahna's Agreements with the Government*

■ The record before this court indicates that Soares's counsel was provided with all relevant information about Bahna's agreements with the government before the second trial.

Indeed, even before Soares's first trial, the prosecution had alerted his then-retained counsel, Robert Kalina, to the fact that Bahna had made a post-arrest statement exculpating Soares. Mr. Kalina then interviewed Bahna, who explained that his initial statement was false. Bahna advised defense counsel that the government had promised not to call him at Soares's first trial. Thus, he had felt free to adhere to his initial statement in the hope that this hearsay could somehow be used to help his brother-in-law. Now confronted with the possibility that he would be called as a witness by the defense, Bahna told Kalina that he would have to testify truthfully as to Soares's knowing involvement in the charged crimes.[4] Mindful of the totality of these circumstances, the defense made an informed decision not to call Bahna at Soares's first trial. *See generally* Letter of Charles Carnesi (Counsel for Bahna) to the Court, November 9, 1990.

Before Soares's second trial, the government did impose a further cooperation requirement on Bahna, *i.e.*, his agreement to testify as a prosecution witness against petitioner. Far from withholding information about the circumstances leading to this change, the government discussed the matter in open court in the presence of Soares and his newly-retained counsel, Judd Burstein. On June 11, 1991, Assistant United States Attorneys Robert Biddle and David Hattem explained to this court that Bahna had seriously violated his initial cooperation agreement by failing to advise DEA agents that his wife had compromised one of their investigations. Nevertheless, in order to avoid litigation with Bahna's counsel over the issue of breach, the government agreed to make a 5K1.1 motion on Bahna's behalf in return for his expanded cooperation: "that quid pro quo

---

4. A June 7, 1990 letter from the prosecutor to Bahna's lawyer reveals that, at this time, Bahna was refusing to discuss Soares with the authorities. Assistant U.S. Attorney Biddle reminded counsel that, although Bahna would not be called as a prosecution witness, his cooperation agreement nevertheless obliged him to make truthful disclosure of his

full knowledge of Soares's involvement in narcotics trafficking. This insistence on truthful disclosure in return for a § 5K1.1 motion is not, as Soares's suggests in his submissions to this court, evidence of improper coercion to get Bahna to retract his post-arrest statement exculpating petitioner.

was, Mr. Bahna has indicated he would testify against Mr. Soares at any subsequent hearing." Transcript of June 11, 1991, at 7–11.

In sum, Soares errs in contending that the prosecution withheld from him the fact that, at least as of 1991, Bahna's receipt of 5K1.1 consideration was dependent on his willingness to testify for the prosecution against petitioner. Similarly meritless is Soares's claim that he was denied evidence showing that the government would make § 5K1.1 motions even for individuals who lied or otherwise breached their plea agreements. The relevant facts were known to the defense well before Soares's second trial.[5]

### B. *The Misconduct of Agent Yoos*

Soares asserts that *Brady/Giglio* obliged the prosecution to disclose a January 7, 1991 tape-recorded conversation between Mark Bahna and DEA Special Agent Robert Yoos. Soares contends that the relevancy of this conversation was not limited to Bahna's credibility. He submits that it calls into question the overall integrity of the government's case because it reveals that (1) invidious ethnic bias infected the investigation, (2) improper attempts were made to interfere with Bahna's attorney/client relationship, and (3) Bahna's cooperation was induced by a threat to prosecute his wife. In fact, the tape recording does not support these claims.

The conversation must be placed in context. Mark Bahna was a major drug trafficker. Although he had signed a cooperation agreement obliging him to disclose fully his knowledge of criminal activities, by January 1991 it was plain that he had not been candid with the authorities. Not only had he tried to ration out information on low-level targets on a piecemeal basis, he had compromised an investigation and possibly even threatened the safety of an uncover agent. Mindful of how seriously

he had blundered, Bahna called Agent Yoos on January 7, 1991, and, between sobs, implored the agent to "try to work something out with me, I'll work for you for the rest of my life, please just give me a chance.... I'm begging now, I'll do anything." In short, this conversation was initiated by Bahna to beg the government to allow him to continue to cooperate, not by government agents to intimidate Bahna.

Agent Yoos had, of course, heard Bahna's self-serving pleas and promises all too often, and admonished him, "You know, you don't understand. That, that type of stuff that you pulled last time, it could cost me my life, it could cost another agent his life." Bahna tried desperately to redeem himself: "I want to tell you about something big that I got for you." The skeptical agent asked for a name. Bahna hedged, "It's, it's, it's a, it's a Colombian name. I don't. I got the name, my wife got the name...." Unimpressed by Bahna's ambiguous stalling, Yoos asked, "What about Italians?"

██ Soares, who is not Italian, argues that this inquiry evidences invidious ethnic bias. He submits that if he had known of this conversation, he would have used it to impeach Agent Yoos and attack the overall integrity of the government's case. In fact, any inquiry into the government's investigative goals in 1991 appears of little relevance to a jury's assessment of Soares's alleged criminal conduct in 1990. In any event, a review of the total conversation makes plain that the ethnic references provide no evidence that invidious bias infected Soares's prosecution. At worst, these were insensitive shorthand references to members of organized crime. Yoos bluntly told Bahna, "I want a mafia guy. You got mafia guys?" The government knew that Bahna had paid organized crime members to be allowed to run his

---

**5.** Soares's complaint that the prosecutor mischaracterized the status of Bahna's cooperation at the time of the second trial is ad-

dressed *infra* in connection with petitioner's claim of prosecutorial misconduct.

drug operation, and yet Bahna had not been forthcoming about these activities.

> The last time you told me, you gave me a list of people who you heard about from this guy, Michael Cardito, and you heard about this, and you heard about that, but you really don't know any of them. You know. And I know you know some of these guys, and I know you've dealt with some of these guys.

Later references to "Italians" are similarly linked to organized crime activities. After Bahna assured Yoos that the agent "won't be dissatisfied" with the information he will provide, Yoos responded, "bottom line is that you know a lot of Italian guys . . . . like Vinnie Nasso, and all of his people. I know you know these people."

The court rejects Soares's contention that the government withheld relevant evidence of ethnic bias.

■ Neither does the taped conversation support Soares's claim that the government was attempting impermissibly to interfere with Bahna's relationship with his attorney. Agent Yoos simply asked Bahna to think about whether he could speak candidly about organized crime figures in front of his lawyer.

> Well, you know the people that he associates with. . . . Everybody knows, you know, he handles a lot of questionable types. Which is fine, there's nothing wrong with it. Do you have enough confidence—and I'm not trying to steer you away from the guy—I'm just saying I don't want that to inhibit you from talking.

When Bahna expressed no concern, Agent Yoos did not pursue the matter further. Instead, he instructed Bahna to have his attorney call the prosecutor to set up a meeting the following Wednesday. Nothing in this scenario indicates improper interference with Bahna's Sixth Amendment rights so as to undermine confidence in the outcome of Soares's trial.

■ Finally, although Agent Yoos did discuss with Bahna his wife's involvement in drug trafficking, he did not threaten to prosecute her if Bahna did not provide further cooperation against Soares. What he told Bahna was that based on the information known to the authorities, "your wife could probably be charged too with conspiracy to distribute narcotics." This was certainly true. Nevertheless, Yoos also told Bahna that no such action was contemplated: "I'm not gonna. We're not in the business of, uh, I don't think we, we're even contemplating that, but I'm just saying. There's a whole bunch of things that I heard that I just couldn't believe." This exchange must be viewed in light of fact that it was Elizabeth Soares Bahna who had recently compromised the government's investigation into another target. Understandably, Yoos was concerned about her conduct, but he said nothing to suggest to Bahna that the government's decision not to prosecute his wife was in any way linked to what he said about Armindo Soares. Indeed, Bahna had inculpated Soares months earlier, before petitioner's first trial.

For all these reasons, the court concludes that the government's failure to disclose the January 7, 1991 conversation between Yoos and Bahna did not deny Soares due process of law.

### C. *Bahna's Statement Regarding Soares's Assets*

■ Equally meritless is Soares's complaint that the prosecution withheld a false statement by Bahna regarding petitioner's hidden assets. Apparently, sometime in 1991, Bahna had advised authorities of a conversation in which Soares had told him that he had withdrawn $40,000 in cash from a safe deposit box to pay his attorney's fee. Since this amount was at odds with the modest earnings testified to by Soares as his first trial, the government subpoenaed Mr. Kalina for information about his fee. A motion to quash by Soares's new counsel, Mr. Burstein, was denied by Chief Judge Platt. Mr. Kalina thereafter reviewed his check book deposit

entries—apparently the only records he had of client payments—and concluded that he had received payment of approximately $26,000 in cash and cashier's checks to represent Soares.

 Petitioner errs in his contention that Bahna's statement about Soares's payment of his attorney's fees constituted *Brady/Giglio* material. Certainly, the statement does not exculpate Soares. Neither has Soares established that the statement could have been used under Fed. R.Evid. 806 to impeach Bahna's co-conspirator declarations. That rule provides in pertinent part:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

The latter provision is plainly inapplicable here since nothing in Bahna's repetition to the authorities of Soares's explanation for the payment of his attorney's fee is inconsistent with any of his co-conspirator statements admitted at trial. As to the first part of Rule 806, not every false statement by a co-conspirator declarant is relevant to credibility. *See United States v. Friedman*, 854 F.2d 535, 569–70 (2d Cir.1988). In that official corruption case, there was undisputed evidence that Queens Borough President Donald Manes had made a false statement to authorities about being abducted and assaulted. Subsequently, Manes admitted that his injuries were self-inflicted. The trial court rejected defendant Stanley Friedman's argument that Manes's false statement was admissible under Rule 806 to impeach his co-conspirator declarations. The Court of Appeals affirmed, ruling that "Manes's false abduction story had no conceivable bearing upon the credibility of his statements … in furtherance of the conspiracy." *Id.* at 570.

So in this case, Soares has failed to show that Bahna's report of what petitioner had told him sheds any light on the credibility of Bahna's statements made in the course of his conspiratorial activities.[6] Indeed, in stark contrast to the scenario in *Friedman*, Soares cannot even establish that Bahna's statement about paying the attorney's fee is false. Certainly Soares has not provided an affidavit contradicting the conversation reported by Bahna, and nothing in Mr. Kalina's sketchy financial records proves that Soares did not make the statements attributed to him by Bahna.

Under these circumstances, the government's failure to disclose Bahna's statement about Soares's payment of his attorney's fees does not evidence a denial of due process so as to warrant a new trial.

**D.** *The Joint Meeting with Bahna and Bencivengo*

 Soares faults the government for failing to disclose a joint debriefing meeting attended by Mark Bahna and Ralph Bencivengo. He submits that, as a result of this meeting, Bencivengo changed his account on one key point: Bahna's presence in the car when Soares displayed a firearm. The relevant chronology, however, does not support this argument.

The joint meeting attended by Bahna and Bencivengo occurred on April 17, 1990. It was *after* that meeting that Bencivengo gave inconsistent accounts of the meeting in the car. At the May 2, 1990 suppression hearing, Bencivengo testified that Bahna was present when the gun was dis-

---

**6.** Similarly irrelevant to Bahna's credibility as a co-conspirator declarant was his subsequent cooperation agreement with the government and his 1991 dealings with Agent Yoos. *See* *generally United States v. Orena,* 145 F.3d at 560 (informant's dealings with federal authorities shed little light on his credibility in dealing with criminal confederates).

played. At the June 1990 trial, he testified that Bahna was not present in the car. Thus, when Bencivengo testified at the 1994 trial that Bahna was not present when the gun was displayed, trial counsel knew that he could impeach Bencivengo with his inconsistent statement from the suppression hearing.[7] The fact of a joint meeting with Bahna and Bencivengo in April 1990 adds nothing that undermines confidence in the outcome of Soares's trial.

## IV. Prosecutorial Misconduct

Soares asserts that misconduct by the prosecutor violated his due process right to a fair trial. Specifically, he complains that the prosecutor misled both the trial judge and the jury as to the status of Mark Bahna's cooperation at the time of the second trial. He further submits that the prosecutor intimidated potential defense witness Mark Bahna by insisting that he recant his statement exculpating Soares in return for 5K1.1 consideration. Neither of these claims has merit.

### A. The Prosecutor's Misleading Statements

#### 1. To the Court

To the extent petitioner complains that the prosecution misled the court, this claim would warrant habeas relief only if he could show that he was thereby prejudiced. Soares cannot do that since the exchange of which he complains had no effect on the evidence adduced at trial.

The challenged statements to the court were prompted by defense counsel's cross-examination of Charles Costa, who testified that he believed his own arrest was prompted by Mark Bahna's cooperation with the authorities. The prosecutor sought leave to ask the witness what he knew about the present status of Bahna's cooperation. In colloquy with the court, the prosecutor explained that "[i]n the view of the U.S. Attorney's Office, Mr. Bahna is not any longer cooperating because of the way he double crossed us." Trial Transcript at 804. The defense objected, specifically challenging the government's assertion that Bahna was no longer cooperating: "I don't think it is true. . . . The reality is they had a big fight over a 5K1 letter. But the government eventually capitulated and gave the 5K1 letter." Id. at 805. The prosecutor replied that the circumstances were more complicated: "[T]he 5K letter was written, and it was withdrawn. Mr. Bahna hired Mr. Lefcourt and went ahead and had a big argument making accusations against Agent Yoos and [AUSA] Biddle. And then, the fact is he will get back the letter but Judge Raggi will know everything." Id. Once again, defense counsel demurred: "I think [the prosecutor] is not intentionally, but I don't think it is an accurate characterization of the facts." Id. at 805-06.[8]

The government does concede that, at the time of Soares's second trial, Bahna was obliged to testify on behalf of the prosecution if called. Thus, it was inappropriate for the prosecutor to suggest otherwise when he asked Costa, "Did you learn that Mark Bahna was not cooperating with the government any longer after you were incarcerated?" Id. at 816. Soares was not prejudiced, however, because this question was not answered. Judge Platt promptly sustained a defense objection on the ground that Costa lacked first-hand knowledge of the facts. Id. at 816-17. Ultimately, the jury heard no evi-

---

7. In fact, trial counsel chose not to question Bencivengo about his suppression hearing version of events, a reasonable exercise of discretion given that Bencivengo was standing by a version more rather than less favorable to Soares.

8. In the proceedings leading up to Bahna's sentencing, it became apparent to this court that there was a difference of opinion among the various Assistant United States Attorneys who dealt with Bahna as to whether offers of further cooperation should be accepted from an individual who had compromised an investigation. The prosecutor whose conduct is here challenged was among those more hostile to Bahna's continued use.

dence as to the status of Bahna's cooperation at the time of trial. Thus, whether the prosecution statements to the court about Bahna's cooperation were accurate or not, they did not deny Soares a fair trial.[9]

### 2. To the Jury

 In rebuttal summation, the prosecutor made the following statement that, while unobjected to at trial, is now challenged by petitioner:

> You know, ladies and gentlemen, do not be deceived. You did hear Charles Costa give you his view that Mark Bahna set him up and Mark Bahna was cooperating. There is no evidence before you. There is nothing to suggest that Mark Bahna is cooperating with the government right now.

Trial Transcript at 963. While the statement was technically correct—there was no evidence before the jury as to Bahna's current status as a cooperator—it is undisputed that Bahna was obliged to provide assistance to the prosecution at the time of Soares's second trial. Indeed, he would have had to testify if called as a prosecution witness. To the extent the prosecutor's remarks could be interpreted otherwise, the statement was misleading. Nevertheless, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). To secure relief, a petitioner must show that the challenged remarks, when viewed in context, were "so egregious" as to cause "actual prejudice," specifically, "a substantial and injurious effect or influence in determining the jury's verdict." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir. 1998) (and cases cited therein).

 In applying this standard, a reviewing court must consider that "'the Government is ordinarily permitted to respond to arguments impugning the integrity of its case, and to reply with rebutting language suitable to the occasion.'" *United States v. Myerson,* 18 F.3d 153, 163 (2d Cir.1994) (quoting *United States v. Bagaric,* 706 F.2d 42, 60 (2d Cir.1983)) (citation and internal quotations omitted). The rebuttal language here at issue was plainly an attempt to respond to just such an attack premised on the government's failure to call Mark Bahna as a witness. Defense counsel argued to the jury:

> Mark Bahna was a cooperating witness? That's what Costa told you. In the spring of 1990 Mark Bahna was a cooperating witness, just like Bencivengo and just like Sahi and just like Glenn Schaeffer. And given the deals that the government made with each of these people, you have the right based upon this evidence, all that is before you, you can infer that Mark Bahna has a similar deal. And if not, how come the government didn't put on any proof showing that he didn't have a similar deal.

> If Mark Bahna has such a deal, and you may conclude he does from the evidence before you in this trial, why wasn't he called as a witness?

**9.** Similarly irrelevant to resolution of the motion pending before this court is a subsequent exchange between the court and counsel. Mr. Burstein advised Chief Judge Platt that he had, that day, spoken to Bahna's counsel, who reported that both Bahna's cooperation agreement and his 5K1 letter were "back in effect." *Id.* at 818. Indeed, Bahna's counsel advised Mr. Burstein that the prosecutor had contacted him a few weeks earlier to speak to Mr. Bahna. Counsel assured him that Bahna was available for an interview. *Id.* at 819. The prosecutor did not deny these facts. Instead, he reiterated the circumstances that had led the government to withdraw and then reinstate Bahna's 5K1.1 letter: "[W]hat Mr. Bahna did is promise[ ] to cooperate against organized crime figures and [then] tipped them off that they will be cooperated against.... After serious negotiation the decision was [made to] give him back his letter, and we will tell Judge Raggi everything he did." *Id.* at 820. Assuming *arguendo* that there was anything misleading about these statements, they would not support a writ of habeas corpus since they did not prompt any ruling adverse to Soares at trial.

There is an obvious answer ladies and gentlemen. Unlike the other witnesses in this case, who are not married to Armindo Soares' sister, Mark Bahna obviously couldn't bring himself in here and lie about Armindo Soares to help himself. That's why the government didn't call him. They knew that he wouldn't lie, that he was insisting that Armindo Soares was innocent. And you could also conclude that Mark Bahna nonetheless didn't want to testify for Armindo Soares, because he—you can conclude from the evidence that there is a cooperation agreement in effect and that Mark Bahna is afraid that he will lose it if he comes in here and gives evidence that the government would not like, and they could send him to jail for years and years and years.

Trial Transcript at 948–49. In sum, defense counsel sought to take advantage of Bahna's absence as a witness to spin inferences that he knew were untrue: (1) that Bahna stood ready to exculpate Soares, (2) that the government knew that fact, and (3) that Bahna was reluctant to take the stand because, if he told the truth, the government would retaliate by denying him the sentencing benefits of his cooperation agreement. In fact, trial counsel knew that on the eve of Soares's first trial, long before the government considered voiding Bahna's cooperation agreement because his wife had compromised another investigation, Bahna had met face to face with Soares's first trial lawyer and told him that if he were called as a trial witness and sworn to tell the truth, he would testify that Soares was a knowing and willful participant in the charged crimes. While it might have been preferable for the prosecutor to attack the defense's groundless summation arguments more directly, Soares cannot complain that he was "unfairly prejudiced" by the prosecutor's observation in rebuttal that the premise on which these arguments were based, i.e., that Bahna was then cooperating with authorities, was not established by the evidence in the case.

Petitioner's efforts to analogize this case to *United States v. Kojayan,* 8 F.3d 1315 (9th Cir.1993) are unpersuasive. In *Kojayan,* a federal prosecutor falsely told a jury in rebuttal that he could not have called a co-conspirator as a witness because that witness would invoke his Fifth Amendment right to remain silent. *Id.* at 1317–18. In fact, the government had entered into a cooperation agreement with the witness that obligated him to testify. Prior to trial, the prosecutor had refused to disclose its agreements with this witness to the defense. Indeed, the potential witness's own attorneys also refused to disclose any such agreements. *Id.* at 1317. In this case, by contrast, Soares's counsel was informed by both the prosecutor and defense counsel of the tortured history of Bahna's cooperation with the authorities. More importantly, the prosecutor in this case never suggested to the court or the jury that the government could not have called Bahna as a witness. Indeed, Bahna was available to both sides.[10]

While the high ethical responsibilities of a prosecutor make it imperative that he not mislead either the court or the jury in any respect, the totality of circumstances in this case reveals that any misimpression that may have been created about Bahna's status as a cooperator did not unfairly prejudice Soares or deprive him of his right to a fair trial.

### B. *Prosecution's Interference with Defense Right to Call Witnesses*

Soares asserts that the prosecution violated his Sixth Amendment right to call witnesses when it coerced and intimidated Mark Bahna into recanting his origi-

---

10. Thus, as the Court of Appeals discussed in its opinion affirming Soares's conviction, petitioner was not entitled to a charge instructing the jury that the government's failure to call Bahna supported an adverse inference against the prosecution. *See United States v. Bahna,* 68 F.3d at 22.

nal statement exculpating petitioner. This contention is without any factual support. Even before Soares's first trial, Bahna explained to defense counsel that his post-arrest attempt to exculpate his brother-in-law was false. Thus, the record will not support Soares's conclusory assertion that Bahna was obliged to recant and testify falsely in order to avoid a prosecutorial threat to void his cooperation agreement, prosecute his wife, or otherwise intimidate him.

■ In any event, the Constitution protects a defendant's right to call witnesses. It does not guarantee favorable testimony. See generally Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (threats that dissuade a potential defense witness from testifying can, in certain circumstances, violate due process); accord United States v. Pinto, 850 F.2d 927, 932 (2d Cir.1988). In this case, Bahna was always available to testify on behalf of the defense and to have his various versions of events subject to skillful examination. Mindful of his availability, two able defense attorneys nevertheless decided that it was not in Soares's interest to have Bahna testify. These circumstances do not evidence a Sixth Amendment denial warranting a new trial.

## V. Intimidation of Defense Witness by Trial Judge

■ Equally meritless is Soares's contention that Judge Platt somehow violated his Sixth Amendment right to have William Lombard testify on behalf of the defense. At his plea allocution before Judge Platt, Lombard testified that he had conspired with Mark Bahna to deal drugs, but that Armindo Soares had not been a member of that conspiracy. Mindful that the government had witnesses identifying all three men as co-conspirators, Judge Platt cautioned Lombard that he might not get acceptance of responsibility credit for his plea if evidence at Soares's trial indicated that his allocution was perjurious. See Transcript of Lombard Plea at 30.

Although Soares now contends that this statement so intimidated Lombard that Soares was deprived of his right to call him as a witness, the record does not support this claim. Soares did not endeavor to call Lombard to testify at his second trial. Thus, there is no evidence indicating that, if he had been called, Lombard would have refused to testify, much less that any such decision would have been influenced by the challenged remarks of Judge Platt. The court finds that Soares was not denied his constitutional right to call witnesses.

## VI. Sufficiency of the Evidence on Attempt

■ In moving for a new trial, Soares's attorney, Mr. Burstein, forcefully argued, inter alia, that the prosecution had failed to sustain its burden of proof on the attempt charge. New counsel labels Mr. Burstein's advocacy constitutionally ineffective because he did not correct an erroneous factual assumption made by this court in ruling against petitioner, i.e., that Soares and Bahna had actually brought the purchase money to their January 4, 1990 meeting with Bencivengo. In fact, it appears that Bahna represented to Bencivengo that he had the money at a location ten to fifteen minutes away from the meeting site. Soares further faults Mr. Burstein for not pursuing the sufficiency challenge in the Court of Appeals. These Sixth Amendment claims are without merit. Petitioner was not prejudiced by the purported omissions of counsel since the record is sufficient to support his conviction of attempted drug possession.

■ A petitioner who challenges the sufficiency of the evidence relied upon by a jury to find him guilty of a crime carries a "very heavy burden." United States v. Soto, 716 F.2d 989, 991 (2d Cir .1983). To secure relief, he must show that, even when the evidence is viewed in the light most favorable to the prosecution and when all inferences are drawn in its favor, no rational trier of fact could have

found the essential elements of the crime proved beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir.1994). Soares cannot meet this burden.

A defendant is guilty of attempting to commit a crime if the evidence establishes beyond a reasonable doubt (1) that the defendant intended to commit the crime charged, and (2) that he willfully took some action that was a substantial step in an effort to bring about or accomplish the crime. *See, e.g., United States v.. Delvecchio,* 816 F.2d 859, 861 (2d Cir. 1987). A substantial step must be "something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *United States v. Manley,* 632 F.2d 978, 988 (2d Cir.1980). The formula is easier to state than to apply. *See United States v. Delvecchio,* 816 F.2d at 861. As Judge Friendly noted in *United States v. Ivic,* 700 F.2d 51, 66 (2d Cir. 1983): "This is a classic example of a legal doctrine where although the principle is clear, its application is fraught with difficulty." *See United States v. Ivic,* 700 F.2d at 67 (applying "substantial step" analysis) (abrogated on other grounds by *National Org. for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)).

The factual distinctions between *Delvecchio,* wherein the Court of Appeals found insufficient evidence of an attempt, and *Ivic,* wherein the Court found the evidence sufficient to support a conviction, are instructive. In *Delvecchio,* as in this case, federal agents planned to sell heroin to two targets. But in *Delvecchio,* the parties never progressed past the planning phase of their endeavor. Although they agreed on the quantity and price of the drugs at issue and the date and site of the actual sale, when that date arrived, the targets failed to appear. *United States v. Delvecchio,* 816 F.2d at 861. The Court of Appeals reversed defendants' convictions for attempted possession of narcotics hold-

ing that "evidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction." *Id.* at 872. What was lacking was a "substantial step taken to bring about the crime, specifically, '[t]here was no evidence that appellants had set out for the meeting site but turned back; nor was there any evidence that they had either acquired or attempted to acquire the almost one million dollars necessary to complete the purchase.'" *Id.* at 862.

In this case, however, Soares and Bahna had taken just the steps found lacking in *Delvecchio.* Specifically, when these two men drove into Caesar's Bay Bazaar on January 4, 1990, they were not coming to explore the possibility of dealing in drugs with Bencivengo. Rather, they were at the site on the date previously agreed to by the parties for the actual consummation of a ten kilogram transaction. Further, although this court may have erred in thinking that the targets actually had the purchase money with them, Bahna did assert that he had the necessary funds available a short distance away for immediate transfer once he had satisfied himself that the drugs were as represented. It was only when this demand for inspection was rejected that the sale was aborted.

Soares and Bahna thus got further along in their attempt to possess drugs than the parties in *Ivic* did in their attempt to bomb a travel agency. Yet in that case, the Court of Appeals upheld the conviction for attempt. The evidence in *Ivic* showed that one defendant had surveilled the travel agency targeted for a terrorist attack. He proposed a means for planting an explosive device to his confederate and secured his approval. The explosives needed to carry out the scheme were acquired. Soon thereafter, however, one of the defendants concluded that he had been the subject of electronic surveillance, and so the bombing scheme was abandoned. The Court of Appeals ruled that, although the case was close, when the evidence was viewed in the light most favorable to the government, it

was sufficient to support the jury's conclusion that defendants had "unequivocally set out upon a criminal course" to attempt the charged bombing. *United States v. Ivic*, 700 F.2d at 67.

So in this case, it does not matter that Soares and Bahna did not actually bring the buy money with them to the shopping mall on January 4, 1990, or that they did not actually take possession of the drugs on that date. The evidence viewed in the light most favorable to the government shows that they were ready, willing, and able to consummate the drug deal on January 4, 1990, and that their trip to Caesar's Bay Bazaar was a substantial step in furtherance of the crime. This was sufficient evidence to support the conviction for criminal attempt.

## VII. *Ineffective Assistance at Sentencing*

This court sentenced Soares to two concurrent terms of 188–months' incarceration, the low end of his guideline range. The court's guideline calculation started with a base offense level of 34 in light of the parties' agreement that the appropriate quantity of narcotics attributable to Soares was at least fifteen but less than fifty kilograms of cocaine. The court enhanced this level by two points for petitioner's attempt to obstruct justice at his first trial through his own perjurious testimony. Thus, with a total offense level of 36 and a criminal history category of I, Soares faced a 188–235 month term of incarceration.

Soares now presents a laundry list of complaints about Mr. Burstein's representation at sentencing. He faults counsel for failing (1) to argue that he should have been sentenced within the guideline range predicted by the government in an October 1993 plea offer, (2) adequately to challenge the obstruction enhancement, (3) to seek a downward departure based on (a) petitioner's positive post-offense conduct, and (b) prosecutorial misconduct, and (4) to urge a mitigating role adjustment. The record before this court shows that Mr. Burstein

was a forceful advocate on Mr. Soares's behalf at sentencing and that the arguments now advanced would not have secured a more favorable sentence.

### A. *Failure to Seek Downward Departure or Equitable Estoppel Based on Government's Guideline Misrepresentations*

Soares asserts that trial counsel should have sought a guideline departure based on representations made by the prosecution about his likely guideline level in a plea offer rejected by him in late 1993. In the alternative, he submits that counsel should have moved to bar the government from urging any guideline calculation other than that set forth in the 1993 plea offer. The argument warrants little discussion.

In a letter dated October 23, 1993, the prosecutor did propose that Soares enter a guilty plea pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, with an agreed upon sentencing "cap" of 96 months. In its letter, the government expressed its "opinion" that Soares's guideline range would be "approximately 121–151 months."

Since Soares never accepted this plea offer, he cannot assert reasonable reliance on any term contained therein. In any event, the government's estimate was calculated based on certain assumptions that did not pertain at the time of Soares's actual sentence. Specifically, the estimate assumed that, by pleading guilty, Soares would receive credit for acceptance of responsibility. This benefit is generally not available to a defendant who puts the prosecution to its burden of proof at trial. Further undercutting Soares's argument is a principle known to every lawyer who has represented him: the government's sentencing predictions are not binding on the court. Indeed, this court can say without hesitation that even if counsel had advanced the departure/estoppel argument now urged in support of Soares's § 2255

motion, it would not have proved persuasive.

In sum, since Soares was not entitled to rely on representations in a rejected plea offer and since he has not been prejudiced by his trial counsel's failure to make a motion for departure/estoppel, this part of his Sixth Amendment challenge is rejected as without merit.

### B. *Failure Adequately to Challenge Obstruction Enhancement*

■ At sentencing, Mr. Burstein argued at length against a guideline enhancement for obstruction of justice. *See* Sentencing Transcript at 10–18. Soares now complains that Mr. Burstein did not advance the best arguments to support this position. Specifically, his new attorney suggests that Soares's testimony was not strictly perjurious because the conspiracy charge on which he is now convicted was narrowed from that pursued at the first trial. Thus, he should not be penalized for responding "No," when counsel asked "Did you conspire with Mark Bahna in this case as the government alleges, *as the indictment charges?*" Trial Transcript at 834 (emphasis added). He further contends that even if Soares's testimony was false, it was more likely the product of confusion than deliberate falsehood. Finally, he argues that many of the questions Soares was asked about drug trafficking were not material to the specific crimes of conviction. Indeed, he suggests that the testimony in Soares's first trial was not material to his second trial four years later.

This court is unpersuaded. It heard Soares's testimony. His denials were not carefully circumscribed. Neither were they the product of confusion. Soares willfully lied with the specific purpose of obstructing justice. A brief excerpt makes the point:

Q. Did you conspire with anybody in this case to possess cocaine with intent to distribute.

A. No, I did not.

. . . .

Q. On the fourth of January 1990, did you attempt to possess with intent to distribute any amount of cocaine?

. . . .

A. No, I did not.

Q. Were you at Caesar's Bay Bazaar Shopping Center on the fourth of January as the government claims you were?

A. Yes, I was.

Q. Did you help Mark Bahna with a drug deal that day?

A. No, I did not.

Trial Transcript at 835. This court rejects any suggestion that the obstruction enhancement was a product of trial counsel's ineffective advocacy. It stands by its findings at the time of sentence:

What it appears to me he did was take all the facts that he couldn't dispute because there was surveillance on them, acknowledge that he was along that night, acknowledge that he drove the car that night, acknowledge everything agents saw, and then just disagree[ ] with why he was there, take the view that he had come to keep Mr. Bahna company when he was lonely because his wife was out of town, went along with him on a ride to meet a friend, but otherwise, did not know about, was not participating in, and indeed never participated in any kind of a drug deal.

Now those statements, if credited by the jury, would have led to an acquittal in this case. . . . But the fact is that with all the evidence before me, I think he did perjure himself. I think he lied.

He's been dealing drugs not only on that night, but on many other occasions as well. And he tried to portray himself to this jury as a handworking young man who had never done anything like that.

It was deliberately false. It was a material matter. And it was done with the purpose of seeking to avoid a fair and just result in this case. I think those

are the standards for the obstruction enhancement.

Sentencing Transcript at 13–14. *See United States v. Zagari*, 111 F.3d 307, 328–29 (2d Cir.) (obstruction of justice can be based on perjury in proceeding closely related to criminal prosecution provided trial judge finds that false testimony concerned a material matter and was given with willful intent to obstruct justice), *cert. denied* 522 U.S. 988, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997).

### C. *Departure for Positive Post–Offense Conduct*

■■■ Soares faults trial counsel for not seeking a downward departure based on his positive post-offense conduct, including, his procurement of steady employment, his financial assistance to his parents, and his engagement to be married. Petitioner submits that a motion for downward departure on these grounds would have been particularly compelling when considered in light of the four-year interval between his first and second trial, and the disparity between the government's initial guideline prediction and the court's final guideline calculation.

This court disagrees. For reasons already discussed, petitioner could not reasonably rely on guideline estimates in a rejected plea offer. The court has carefully considered the other factors cited in light of the arguments advanced by new counsel and concludes that they are not so extraordinary as to warrant a downward departure in sentence. This aspect of Soares's Sixth Amendment claim is rejected as without merit.

### D. *Departure for Government Misconduct*

■■■ Soares further contends that it was objectively unreasonable for trial counsel not to seek a sentencing departure for government misconduct. He cites the

government's failure to disclose the terms of its cooperation agreements with Mark Bahna, the prosecutor's misrepresentations regarding Bahna's cooperation at trial, the government's intimidation of Bahna and Lombard, and the government's misrepresentations as to the applicable guideline range. The court has already found that, with the exception of the prosecutor's possibly misleading statement in rebuttal regarding the status of Bahna's cooperation, all the other claims of misconduct are factually unsupported. The court finds that the rebuttal statement would not have supported a sentencing departure. Accordingly, trial counsel's failure to argue this point did not violate the Sixth Amendment.

### E. *Mitigating Role*

■■■ Soares complains that Mr. Burstein made only a "pro forma" application for a mitigating role adjustment in his guideline calculation. In fact, the record reveals that Mr. Burstein argued this point at length. *See Sentencing Transcript* 20–32. As the party seeking the role adjustment, Soares had the burden of establishing its applicability. *See United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997); *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir.1992). This court was unpersuaded by a preponderance of the proffered evidence that Soares was entitled to any adjustment. It did, however, offer to hold a hearing.

> But I can't say that I know what his role was in the ten kilos or anything else that he is supposed to have dealt with Mr. Bahna.
>
> And Mr. Bahna says that they—they were business partners. I am prepared to assume that Mr. Bahna was the Senior partner, or a superior partner.[11] But I don't see this as minimal, which the guidelines themselves say is reserved for only a few cases in which someone is

---

**11.** Bahna's guidelines were enhanced to reflect his superior role in the charged conspir-

acy.

such a peripheral player as the examples given would warrant.

I don't even see where I have the evidence to support a minor role adjustment. I just don't know what Mr. Soares' role here was.

Sentencing Transcript at 27–28. After consulting with Soares and counsel for Bahna, Mr. Burstein initially advised that petitioner did desire a hearing, *id.* at 31, only to reverse that decision a few minutes later, *id.* at 32. The court confirmed the choice with Soares.

THE COURT: Mr. Soares, Mr. Burstein has represented you vigorously for several weeks, if not months, in my courtroom. Have you had a chance to talk to him, as well as to the two gentlemen who represent Mr. Bahna.

All of them can give you their advice. But I really want to be sure that this is what you want to do because in the weeks or months or years ahead, I don't want to hear that you didn't have the opportunity to have this testimony before the court. Is this your decision not to call Mr. Bahna?

DEFENDANT: Yeah. I'm going to rely on my attorney's advice.

*Id.* at 32–33. Given the risk that Bahna could provide more damaging evidence of petitioner's culpability if he were to testify at a hearing, it was not objectively unreasonable for trial counsel to advise Soares to forego a hearing.

In his most recent submissions to this court, Soares selectively cites those portions of the record that would support a mitigating role adjustment. He still fails, however, to address the contrary evidence adduced at trial or proffered by the government at sentencing. Accordingly, the court stands by its original conclusion: the proffered evidence is simply insufficient to support a finding by a preponderance of the evidence that Mr. Soares played either an aggravating or minimizing role in the drug crime for which he has been convicted.

### Conclusion

The vast majority of petitioner's claims are procedurally barred from collateral review since he failed to present them on direct appeal and cannot show good cause to excuse this default. The court specifically rejects the argument that the ineffective assistance of counsel on appeal constitutes such good cause. The attorney who represented petitioner at his second trial and on appeal was a vigorous and conscientious advocate throughout. In any event, petitioner is not entitled to an order vacating either his conviction or sentence since his myriad claims are without merit. He was not denied *Brady/Giglio* material. Neither was he denied due process as a result of misconduct by the prosecution or the trial judge. The motion pursuant to § 2255 is denied as is a certificate of appealability.

*SO ORDERED.*