Dated:

Hon. Colleen McMahon
United States District Judge

UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdul-

lah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud AL-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR.1023(LBS).

United States District Court,
S.D. New York.

Oct. 5, 2000.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Kenneth M. Karas, Patrick J. Fitzgerald, Michael J. Garcia, Paul W. Butler, Andrew McCarthy, Assistant United States Attorneys, for U.S.

Paul J. McAllister, Charles D. Adler, New York City, for Defendant Salim.

James Roth, New York City, for Defendant Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El Hage.

Frederick H. Cohn, Laura Gasiorowski, New York City, for Defendant Al-'Owhali.

Jeremy Schneider, David Stern, New York City, for Defendant Khamis Mohamed.

## OPINION

SAND, District Judge.

The Defendants are charged with numerous offenses arising out of their alleged participation in an international terrorist organization led by Defendant Usama Bin Laden and that organization's alleged involvement in the August 1998 bombings of the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Presently before the Court are Defendant El–Hage's motions (1) to quash any outstanding grand jury subpoenas issued to Farid Adlouni, Khadar Ibrahim, Khalil Zaidan, Mustafa Elnore and Moataz al-Hallak and (2) to suppress, or alternatively, to provide a copy of the grand jury testimony of Moataz al-Hallak. For the reasons set forth below, these motions are denied.

### I. Background

A detailed factual background of this case was set forth in the Court's memorandum and order addressing the Defendants' request for a bill of particulars. *See United States v. Bin Laden,* 92 F.Supp.2d 225, 228 (S.D.N.Y.2000). Because these motions call into question the Government's investigation of this case and its use of the subpoena power of the grand jury, a brief summary of the relevant history is included.

The charges currently pending against each of the defendants in this case arise from their alleged involvement with an international terrorist organization known as "al Qaeda" or "the Base." (*See* Indictment S(7) 98 Cr. 1023(LBS) ¶ 1.) Since its emergence in 1989, al Qaeda is believed to have planned and financed (both independently and in association with other terrorist groups) numerous violent attacks against United States personnel and property abroad. (*See id.* ¶¶ 1, 12.) Among other things, the Government alleges that al Qaeda coordinates the activities of its global membership, sends its members to camps for military and intelligence training, obtains and transports weapons and explosives, and explicitly provides Muslims with religious authority for acts of terrorism against American citizens. (*See id.* ¶ 12.) The United States Attorney's Office in the Southern District of New York has been investigating al Qaeda since at least 1996. (*See id.* ¶ 72; *See also* Affirmation of Patrick J. Fitzgerald of Jan. 24, 2000 ¶ 6 (dating the involvement of the United States Attorney's involvement in the investigation to late 1995 or early 1996).) The ongoing grand jury investigation of al Qaeda is characterized by the Government as "long term, expansive and complex." (Government's Memorandum of Law in Opposition to Defendant Wadih El Hage's Motion to Quash Grand Jury Subpoenas at 2.) The Government states that "[i]t involves numerous fugitives and conspirators who remain unidentified to the grand jury" and "continues … to be wider in scope than even the parameters of the admittedly broad schemes outlined in the most recent indictment." (*Id.*)

### II. Discussion

In his motion, Mr. El–Hage offers alternate bases for Court action: he alleges, first, that the Government is improperly using the grand jury as a trial preparation device and, second, that the Government is attempting to use the power of the grand jury to dissuade these witnesses from testifying favorably for the Defendant. These two charges are reviewed in turn.

### A. The Alleged Use of the Grand Jury for Trial Preparation

■ Numerous cases have restated the proposition that "[i]t is improper to utilize

a grand jury for the sole or dominating purpose of preparing an already pending indictment for trial." *United States v. Dardi*, 330 F.2d 316, 336 (2d Cir.1964) (quoting trial court). *See also United States v. Jones*, 129 F.3d 718, 723 (2d Cir.1997); *United States v. Sasso*, 59 F.3d 341, 351 (2d Cir.1995); *United States v. Leung*, 40 F.3d 577, 581 (2d Cir.1994); *United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir.1989); *In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985). A close review of these cases, however, illuminates the limited reach of this well-settled rule. In *Leung*, the Second Circuit explained that "[b]ecause a presumption of regularity attaches to grand jury proceedings, a defendant seeking to exclude evidence obtained by a post-indictment grand jury subpoena has the burden of showing that the Government's use of the grand jury was improperly motivated." 40 F.3d at 581 (citations omitted). *See also United States v. Sasso*, 59 F.3d 341, 352 (2d Cir.1995) ("There is a presumption that [a post-indictment] subpoena had a proper purpose."); *United States v. Raphael*, 786 F.Supp. 355, 358 (S.D.N.Y.1992) ("[A]bsent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the grand jury proceedings is proper.").

There appears to be only one Second Circuit case in which the court has quashed a grand jury subpoena.[1] In *Simels*, the Second Circuit reviewed the subpoena issued to the defendant's attorney which sought documents regarding the attorney's fee arrangement with the defendant. *See* 767 F.2d 26. The grand jury subpoena was issued to replace a trial subpoena which had requested the same information. For the *Simels* court, the timing of the grand jury subpoena shed "significant light on its purposes." *Id.* at 29. Because the grand jury had otherwise been completely inactive during the relevant period, the defendant was able to establish persuasively that trial preparation was the dominant purpose of the government action. Although the *Simels* court acknowledged the usual difficulty of enforcing the rule prohibiting the improper use of the grand jury, in the face of this set of very clear cut facts, the subpoena was quashed. *See id.* at 30. The *Simels* case is easy to distinguish from the rest of this line of cases because the government's improper purpose was patently obvious from the series of events.

In other cases, less compelling forms of circumstantial proof have been dismissed by the court as insufficient evidence of improper government conduct. In *United States v. Leung*, for example, the defendant alleged that the government's subpoena of her bank records was for the primary purpose of trial preparation. 40 F.3d at 581. The government stated that the subpoenas "were issued as part of a continuing investigation into potential money laundering charges" and was not required to produce any specific proof of the grand jury's purpose. *Id.* at 581. The Second Circuit indicated that the fact that the grand jury did not subsequently indict other individuals or supersede its indictment of the defendant was not dispositive proof that its investigation was improper. *See id.* at 581–82. *See also United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir.1989) (holding that there was "no improper use of the grand jury subpoena" where the government offered a "valid" reason for issuing the subpoena which was that it

---

1. In at least one other case, a Southern District of New York judge found the conduct of the government suspicious enough to warrant further inquiry. In *United States v. Raphael*, 786 F.Supp. 355 (S.D.N.Y.1992), the government subpoenaed several defense witnesses after its second attempt to convict the defendant but before the third trial. After determining that "the government's conduct during these proceedings has from time to time raised serious question," Judge Sweet ordered the government to turn over the suspect grand jury transcripts for an in camera inspection. *Id.* at 359. While the judge examined the materials to assess "whether the dominating purpose" had been trial preparation, the outstanding subpoenas were adjourned. *Id.*

intended to add additional counts in a superseding indictment); *United States v. Jones,* 129 F.3d 718, 723 (2d Cir.1997) (indicating that "post-indictment action is permitted to identify or investigate other individuals involved in criminal schemes or to prepare superseding indictments against persons already charged"). Ultimately, the *Leung* court ruled in favor of the government and explained that the defendant's "speculations about possible irregularities in the grand jury investigation were insufficient to overcome the presumption that this investigation was for a proper purpose." 40 F.3d at 582.

In *United States v. Sasso,* the Second Circuit rejected the defendant's assertion that the grand jury's post-indictment subpoena of his telephone records was improper. *See* 59 F.3d 341. The government indicated that the subpoenaed records were used in its continuing investigation of other individuals who may have participated in the gun-running scheme for which the defendant was indicted. *See id.* at 352. In *Sasso,* the court explained that "where there was some proper dominant purpose for the post-indictment subpoena, ... the government is not barred from introducing evidence obtained thereby." *Id.* at 351–52.

■ The Defendant asserts that the timing of the subpoenas, relative to the dates of the indictments, is suspicious and claims that the witnesses in question are persons with whom he has only innocent associations and that they have no connection to the alleged conspiracy. (*See* El–Hage Letter re: Grand Jury Subpoena Issued to Farid Adlouni ("El–Hage Letter") at 5.) For those reasons, he claims that "[i]t is simply inconceivable that their testimony in the grand jury could be related to anything other than the content of the present indictment and the forthcoming trial thereof." (*Id.*) Given Mr. El–Hage's explanation of his connection with

each of the potential grand jury witnesses, it is certainly possible that their grand jury testimony could benefit the government in preparing for trial. However, the law only permits a grand jury subpoena to be quashed where trial preparation is the sole or dominant purpose of its issuance. *See Leung,* 40 F.3d at 581. Based on the precedents reviewed above and in light of the nature of the ongoing investigation of al Qaeda, Mr. El–Hage's speculations about the Government's motives are insufficient to overcome the presumption of regularity. Unlike *Simels,* where prosecutorial impropriety was the only reasonable inference that could be drawn from the facts presented, the Government's indication, in this case, that the subpoenas that have been issued are part of its ongoing, far-reaching investigation into al Qaeda is as plausible an explanation of the circumstances as the one offered by Mr. El–Hage. The Defendant has failed to show that the subpoenas in question were issued for an improper purpose and therefore his motion is denied.[2]

## B. Alleged Prosecutorial Intimidation of Witnesses

■ Mr. El–Hage's second assertion is that the Government has acted to discourage potential witnesses from testifying for the defense. This is a serious allegation. In a criminal case, the accused has a constitutionally protected right to present a defense. *See Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). There are a handful of cases where defendants have successfully sought reversals of their convictions based on government interference with defense witnesses.

**2.** The conclusion of the Court was reached independently of the Government's *ex parte* affidavits but was confirmed by them.

In *United States v. Vavages,* 151 F.3d 1185 (9th Cir.1998), the prosecutor communicated several times to a potential witness's attorney that he did not believe the defendant's alibi defense. He also emphasized that if the witness testified falsely, she could be charged with perjury and the government could withdraw from its plea agreement with her (in an unrelated case). After determining that the prosecutor had acted improperly, the court concluded that the prosecutor's actions were a "but-for" cause of the witness's subsequent refusal to testify. 151 F.3d at 1188. The court explained that the defendant bears the burden of proving prosecutorial interference by a preponderance of the evidence and reversed the defendant's conviction. The *Vavages* court articulated the standard as follows: "A defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness's decision whether to testify." *Id.* at 1189.

The court's holding in *Vavages* was based in part on a Supreme Court ruling which held that a trial judge's extended warning to. a defendant's only witness about the possibility of a perjury prosecution was excessive and improper. *See Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) ("In light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness's mind as to preclude him from making a free and voluntary choice whether or not to testify."). The *Vavages* court extended *Webb* to apply to situations where the overreaching actor is a prosecutor. *See Vavages,* 151 F.3d at 1189. *See also United States v. Morrison,* 535 F.2d 223, (3d Cir.1976) (explaining that an Assistant United States Attorney was "a figure somewhat lower in the hierarchy than the trial judge but nonetheless the symbol of the government's power to prosecute offenders.").

The Second Circuit refined this test in *United States v. Williams,* 205 F.3d 23 (2d Cir.2000), where the court explained that "judicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Id.* at 29. However, the court noted that the right to present a defense is "subject to 'countervailing public interests,'" including the interest in "preventing perjury and investigating past criminal conduct." *Id.* The *Williams* court was very clear about the standard that a defendant would have to meet:

> To establish a violation of the right, a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means. In addition, we have held that a defendant pressing such a claim must show bad faith on the part of the Government. Finally, in order to elevate this misconduct to a due process violation, the defendant 'must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' 205 F.3d at 29–30 (citations omitted).

In the instant case, the Defendant's speculative allegations do not meet the strict standard set forth in *Williams.* Although Mr. El-Hage asserts that the witnesses in question (whose subpoenas he seeks to quash) would offer material and exculpatory testimony, he doesn't establish that he has actually been deprived of their testimony. (*See* El–Hage Letter at 5–6.) He merely states that his potential witnesses "might very well" be induced to invoke their Fifth Amendment privilege. (El–Hage Letter at 6.) Even when discussing Moataz al-Hallak's refusal to speak to defense counsel, the Defendant can only postulate that it is "most likely due to fear of reprisals by the government." (El–Hage Letter at 8.) At this point, without

knowing the actual impact that any Government action has had or will have on the witnesses' decisions to testify, it is impossible for the Court to evaluate whether the alleged interferences will deprive the Defendant of a fair trial.[3]

In addition, although the Defendant claims that the Government has acted in bad faith, there is no support for this bare accusation. Under the law established in *Williams*, Mr. El–Hage's suspicions, without more, cannot carry the day. *See Buie v. Sullivan*, 923 F.2d 10, 12–13 (2d Cir. 1990) (holding that mere speculation about motives for prosecutor's actions is insufficient to warrant finding of bad faith). The Defendant has failed to show that the Government has, in bad faith, deprived him of material and exculpatory evidence and it is, therefore, unnecessary to consider the third *Williams* factor.[4]

### III. Conclusion

For the foregoing reasons, Mr. El–Hage's motions are denied without prejudice to renewal.

SO ORDERED.

---

**3.** At trial, it will be incumbent upon the Court to investigate the reasons for any witness's refusal to testify and to ensure a proper basis for invocation of the Fifth Amendment privilege. *See United States v. Vavages*, 151 F.3d 1185, 1193 (9th Cir.) (emphasizing that the lower court might have more effectively identified and rectified the prosecutor's misconduct by "ensuring a proper basis for [the defense witness's] invocation of the Fifth Amendment privilege"). Interference with the grand jury investigation at this stage, however, is unwarranted.

**4.** The *ex parte* affirmations are not the basis of the Court's finding because, where the Defendant has failed to meet his burden, the Government is not required to present a defense. The information contained in the affirmations does, however, reinforce the appropriateness of this ruling.